# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4766 | **DATE** | 10/29/2002 |
| **CASE TITLE** | Perry L. Scott, Sr., et al vs. Rodney L. Edinburg, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. For the foregoing reasons, defendants' motion for summary judgment is granted and judgment is awarded to the defendants and against plaintiffs. This is a final judgment. All other pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 3 1 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 69 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| TP | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PERRY L. SCOTT, SR., *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | No. 99 C 4766 |
| ) | |
| v. ) | Judge John A. Nordberg |
| ) | |
| RODNEY L. EDINBURG and VILLAGE OF ) | Magistrate Judge Schenkier |
| GLENWOOD, ) | |
| ) | |
| Defendants. ) | |

DOCKETED OCT 3 1 2002

## MEMORANDUM OPINION AND ORDER

Before the court is defendants' motion for summary judgment. For the reasons stated below, the motion is granted.

## BACKGROUND

This case involves a serious matter – a police officer shooting and killing a man who was trying to steal a car. The facts of the case, however, are not overly complicated and are mostly undisputed.

Defendant Rodney Edinburg was a police officer with the Village of Glenwood. Around 11:10 p.m. on the night of May 17, 1999, he drove into the parking lot of a Marathon gas station located on the south side of Chicago. He was off-duty and was driving his personal car – a Ford Mustang convertible. It was a warm night and the top was down on the car. He parked his car,



leaving the keys in the ignition, and walked up to an adjacent hot dog stand called JJ's. Around 12 to 14 people were in the outside part of the gas station.

As the officer walked up to the hot dog stand, he learned that an individual – later identified as the decedent Phillip Scott – was trying to steal his car.[1] He immediately left the hot dog stand and ran back towards his car, stopping about 3 to 5 feet directly behind the rear bumper. Scott was in the driver's seat with his left hand was on the top of the steering wheel. Edinburg could not see Scott's right hand. At one point in his deposition, he said that Scott appeared to be "digging or looking for something or perhaps turning the ignition of the car." Later in his deposition, he stated that he thought that Scott may have had a gun by virtue of the fact that he could not see Scott's right hand.[2]

Edinburg then yelled "stop, stop," "hey," and "that's my car." The car's reverse lights came on, and the car started moving back towards Edinburg who had to move back in order to avoid being hit. Scott was looking back over his shoulder as he backed up. As Edinburg moved out of the way, he yelled "stop, police" and withdrew his gun from his holster. Two to four seconds later, Scott stopped backing up and immediately starting driving forward.

The first shot was fired sometime during this brief period during which the car was coming to a stop and moving forward. There is a dispute as to exactly when it was fired.

---

[1] Plaintiffs say that there is a dispute as to the exact way in which Edinburg learned of this fact. Either he just happened to turn around or another individual standing at the hot dog stand told him of this fact. This factual difference has no bearing on the issues in this case.

[2] Plaintiffs suggest that these two deposition excerpts are contradictory, raising a fact question as to whether Edinburg actually believed that Scott may have had a gun. However, it is not clear why they are contradictory. The key point is that Edinburg could not see Scott's right hand during the encounter. In any event, we have not relied upon this fact in the analysis below.

Plaintiffs insist that the first shot was fired <u>after</u> the car had started moving forward. Defendants do not agree. At least, they suggest that the issue was not clear. Edinburg's deposition testimony provides support for defendants' position as illustrated in the following excerpt: "[The car] moved back and forward, it was like simultaneously like, I mean, quick to the point to where – I believe it was going forward."[3] Under either version, the first shot was fired before car had moved any appreciable distance and when it was relatively close to the officer.

Edinburg stated that, after the first shot, the car sped off and the tires skidded. He also noticed that two individuals were in the direct path of the car. He further stated that people were moving, ducking, and running away as Scott drove through the parking lot. Plaintiffs have submitted the affidavits of two bystanders who say that no one was in the direct path of the vehicle and no one had to move out of its way. It is undisputed, however, that Scott drove out of the gas station at a "high rate of speed." While Scott was still in the parking lot, Edinburg fired a second shot.

Scott then drove out of the parking lot northbound on State Street. The car was moving at a high rate of speed. Pedestrians were on State Street and at a nearby heavily populated Greyhound bus station. Edinburg pursued Scott on foot and eventually fired 6 to 8 more shots. Scott crashed the car as he was heading toward the Dan Ryan expressway.

The cause of death was a gunshot wound. Two bullets entered Scott's back. There is a minor dispute as to which particular gunshot killed him. Defendants claim that the physical evidence and bullet trajectory suggest that the fatal shot was one of the "very first" shots fired "in

---

[3]We will return to this issue in the analysis section below and will discuss why it has less significance than the plaintiffs believe it does.

the gas station area" at a time when Edinburg was "extremely close to the vehicle." To support this assertion, they have submitted the affidavit of Dr. Mitra Kalelkar, the Deputy Chief Medical Examiner for the Cook County Medical Examiner's office.[4] Plaintiffs have filed a motion to strike, arguing that the Dr. Kalelkar's affidavit is outside the scope of defendants' Rule 26(a) disclosure. Plaintiffs apparently are only objecting to the portion of the affidavit that states that the fatal gunshot was fired while Edinburg was on the gas station property. They are not objecting to the portion asserting that the fatal shot was one of the "first few" fired. Given that the first two shots were indisputably fired while the car was on the gas station parking lot, plaintiffs appear to be interpreting "few" as more than two and are claiming that it is possible that the third or fourth shot was the cause of death.

Plaintiffs in this action are the decedent's father, mother, children, and the children's mother. They have asserted a § 1983 claim under the Fourth and Fourteenth Amendments as well as two state law claims. The Village of Greenwood is named as a defendant under a respondeat superior theory.

## DISCUSSION

The issue in this case is whether Edinburg was justified in using deadly force. Both sides agree that the focal point of the analysis is the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), which addressed the question of whether an officer could use deadly force to prevent the escape of "an apparently unarmed suspected felon." *Id.* at 3. The Supreme Court rejected any rule that would constitutionally authorize the use of deadly force to stop "all" felony

---

[4]In her affidavit, Dr. Kalelkar actually states that the first bullet killed Scott.

suspects "whatever the circumstances."[5] *Id.* at 11. However, the Court did authorize the use of such force under the following circumstances:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12. This test is straightforward and provides the template for this case.

A couple of related legal principles should be noted as well. First, in analyzing whether excessive force was used, courts must approach the question from an objective angle. As the Supreme Court explained,

> the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [citations omitted] An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham v. Connor*, 490 U.S. 386, 397 (1989). Second, the officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight:"

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

---

[5] As this rule suggests, we must always be on guard to avoid any latent tendency towards finding the officer's actions justified based simply on the rough-justice notion that a crime had been committed.

*Id.* at 396-97. This principle means that we should be careful to avoid the natural distortions of hindsight. In this case, as in most such cases, the officer did not have time to engage in extensive rumination or to go through an elaborate decision making process but instead had to "react" based largely on instinct and training and had to do so with limited and imperfect information.

With these principles in mind, we begin by summarizing the key points of Edinburg's version of events. His primary assertion is that Scott was intentionally trying to run him over with the car. Edinburg came to this conclusion based on the fact that Scott clearly saw him and still backed directly at him, that Scott backed the car up "pretty fast," and that Edinburg had to run backwards to avoid being hit. Also, Scott did not bring the car to a complete stop even after Edinburg had identified himself as a police officer.

In his deposition, Edinburg was asked what he was "feeling" when he fired the first shot. He stated: "I felt that since I announced that I was a police officer and he had already tried to run me down that he was willing to run anybody and anything over in front of him. Therefore, he needed to be stopped." In his summary judgment briefs, Edinburg's attorneys set forth a slightly more formal explanation. They state that Edinburg used deadly force because he concluded that Scott was trying to run him over with the car, because he believed that this act constituted a forcible felony under Illinois law, and because he was concerned that Scott might harm the other 12 to 14 patrons in the gas station parking.

Before turning to plaintiffs' arguments, a preliminary conclusion can be stated. Based solely on Edinburg's description of the events, we would find that his use of deadly force was justified under the standard of *Tennessee v. Garner* and therefore would grant summary judgment to the defendants. Under Edinburg's version of events, Scott was deliberately trying to hit him

with the car. This is really the most important fact in this case and the one that sets the stage for all that was to follow. Clearly, when used in this manner, a car is a deadly weapon analogous to a gun. *See Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("a car can be a deadly weapon"); *see also Garvin v. Wheeler*, ___ F.3d ___, 2002 WL 1974397, *5 (7th Cir. Aug. 28, 2002) ("it is objectively reasonable for a police officer to defend himself when a suspect aims a weapon at him").

This action of deliberately backing into an officer directly implicates several of the rationales listed by the Supreme Court in *Garner*. Specifically, Scott "pose[d] a threat of serious physical harm, either to the officer or to others;" he "threaten[ed] the officer with a weapon;" and "there [was] probable cause to believe that he ha[d] committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11-12. Moreover, consistent with *Garner*, Edinburg told Scott that he was a police officer and then pulled out his gun. *Id.* Given that Scott was looking over his shoulder at Edinburg and that it was a short distance between the two men, no argument can be made that Scott did not hear these warnings or see Edinburg pulling out his gun. Scott never stopped the car in response to the officer's commands. Although he did stop backing up, he only did so in order to change gears and drive forward. He failed to stop after the first shot was fired. It was clear that he was determined to get away at all costs.

We recognize that the above account is based on Edinburg's deposition testimony and that there is a general rule of caution in relying on such testimony in resolving summary judgment motions. This rule was summarized in *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994):

> The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial.

*Id.* at 1147. Of course, by itself, this rule is not enough to prevent summary judgment in the officer's favor as the Seventh Circuit has affirmed summary judgment despite this rule in several cases including *Plakas* itself. Moreover, it is not even clear that this rule is applicable here. Unlike some cases in which no one was around, in this case 12 to 14 people were in the vicinity. In fact, as discussed below, plaintiffs have submitted affidavits from two of these people. Thus, this case does not technically fall in the category of one "where the officer defendant is the only witness left alive to testify." Despite this fact, we nonetheless have examined the contextual evidence carefully, which leads to plaintiffs' arguments.

Plaintiffs do not rely on any forensic evidence but instead try to poke holes in Edinburg's story by suggesting that his testimony is internally contradictory, is inconsistent with statements he made immediately after the shooting, and is contradicted by eyewitness testimony. Plaintiffs specifically try to raise questions about two larger points: (i) the assertion that Scott was intentionally trying to back into Edinburg and hurt him; and (ii) the assertion that Scott posed a danger to the other patrons in the parking lot. Finally, plaintiffs point to the fact that their expert concluded that Scott violated a number of police practice rules during the encounter.

Let us look at these arguments more carefully to see if they prevent any serious challenge. Plaintiffs argue that Scott was not trying to harm Edinburg when he backed up the car. The sole basis for this claim is the assertion that Scott backed up the car at a very slow pace. Plaintiffs

believe this fact can be established from Edinburg's deposition testimony. Although they recognize that Edinburg specifically stated in his deposition that the car was backing up "pretty fast," plaintiffs believe that his factual description of the encounter actually suggests that the car was moving at a very slow rate of speed. This is their argument that his testimony is internally inconsistent.

This argument is based on snippets of Edinburg's testimony that were (presumably) plugged into a mathematical time and distance formula to come up with a specific miles per hour that the car was moving backwards. Specifically, plaintiffs note that Edinburg testified that he started from a position of between 3 and 5 feet from the rear of the vehicle, then moved "at least six feet away" in approximately 3 to 4 seconds, and that the car never came within 3 feet of his body. Therefore, plaintiffs calculate that Edinburg retreated at a speed of between 1.36 and 1.02 miles per hour.[6]

Although plaintiffs have made a creative argument, it fails on a number of grounds. For one thing, it seeks to impose a decree of mathematical precision upon matters of human guesswork that are not amenable to such precise analysis. Although Edinburg was asked in his deposition about how far he moved and how long it took, it is clear by his answers that he was making a rough estimate. He said that he moved back "at least" six feet and that it "probably" took 3 to 4 seconds and that he started from somewhere between 3 to 5 feet behind the car. These comments are not precise. For example, plaintiffs appear to assume that Edinburg moved back six feet but the phrase "at least" implies that it could have been a greater distance. What

---

[6] Plaintiffs have not provided the underlying mathematical computations that presumably led to their ultimate conclusion. They appear to be assuming that Edinburg backed up at a constant speed.

-9-

may seem to be slight differences in absolute terms can cause dramatic changes in a mathematical formula when dealing with such small distances and segments of time.

But even granting plaintiffs some benefit of the doubt and assuming that this mathematical argument has persuasive value, it does not necessarily undermine Edinburg's conclusion that he believed Scott was trying to back into him. Even if Scott were moving at a slow or moderate speed, he still could have moved the car in a particular direction toward the officer to give the impression that he was deliberately trying to back into him – or, at least, was trying to threaten him.[7] A slow menacing movement can nonetheless be reasonably perceived as hostile if other contextual factors are present.

Even if plaintiffs could overcome these two hurdles, they would face an even greater one. Their own expert (James Marsh) conceded in his deposition that it was objectively reasonable for Edinburg to believe that Scott was deliberately trying to harm him:

> Q. [W]as it reasonable for Officer Edinburg to perceive that he was dealing with an individual who was deliberately trying to run a car into one who was announced as a law enforcement officer?
> A. Yes.

(Marsh Dep. at 103.)[8] This conclusion is consistent with defendants' expert. It is fair to assume that, if your own expert agrees with the other side's expert and there are no other experts who disagree, you do not have much chance of convincing a jury otherwise.

---

[7] It is worth noting that Scott only testified that the car backed up "pretty fast," something that is different from "very fast."

[8] This was not an isolated comment taken out of context as Marsh reaffirmed this point elsewhere in his deposition testimony. See Marsh Dep. at 77. In addition, plaintiffs have agreed with the defendants' Statement of Fact Number 26, which states: "Plaintiffs' police practices expert, James Marsh, also opined that Defendant Edinburg reasonably perceived that Scott was deliberately trying to hit him with the automobile after announcing his office."

Plaintiffs next take aim at Edinburg's claim that Scott posed a danger to the other people standing outside in the gas station. They argue that this conclusion is contradicted by other eyewitness testimony and by statements Scott made immediately after the shooting. Neither argument is persuasive.

Plaintiffs make the claim that eyewitnesses to the shooting "directly contradict" Edinburg's testimony in "important respects." As set forth below, these eyewitnesses at best raise a minor dispute concerning a non-essential fact.

Plaintiffs have submitted affidavits from two bystanders. Despite having claimed to have witnessed the "incident," these witnesses do not dispute most of the facts as described by Edinburg. For example, they do not say that Scott backed up his car at a slow speed as suggested by plaintiffs. They do state – in identically worded affidavits – the following three propositions: (i) no people were in the "direct path" of the vehicle while it proceeded through the parking lot, (ii) "at no time were there any people who were in danger of being struck by the vehicle," and (iii) "no people ran or were forced to flee from the vehicle's path to avoid being struck by the car."[9]

These bystanders therefore appear to contradict Edinburg's claim that several people were in the "direct path" of the car and that people had to jump or duck to get out of the way of

---

[9]They also make the following statement: "At the times the shots were fired at the vehicle, [Edinburg] was not in the path of the vehicle's movement." It is not clear what this statement means as plaintiffs have not explained it in their briefs. It refers to the point in time when "the shots were fired." Therefore, it does not contradict Edinburg's statement that Scott was intentionally trying to back into him. Plaintiffs appear to be using this statement to reaffirm a point made elsewhere that the car was moving *away* from the officer when the first shot was fired, an issue which is a addressed separately below.

Scott's car.[10] For summary judgment purposes, this testimony is sufficient to create a fact issue on these two points. Yet, it is important to understand just what these facts mean in terms of the larger legal issue.

The relevant inquiry under *Garner* is whether the fleeing felon posed a risk or danger to others. This is a different question from whether bystanders were in the direct path of the vehicle. Although the latter proposition tends to support the former, it is not a necessary prerequisite. Even if no bystanders were standing in the direct path of the car and even if they did not have to move out of the way, they still could have been "at risk." In fact, Edinburg stated in his deposition that he was not simply worried about the two individuals he believed were in the vehicle's path, but also about "any and everybody" in the gas station at the time.

Moreover, it is important to remember that the first shot was fired just as the car was beginning its journey through the parking lot. It is at that static point that the officer made the judgment that Scott presented a threat to others. Does it really matter whether, at that particular instant, someone was directly in the path or merely standing nearby? It is hard to imagine that, given the amount of people in the area and assuming a normal-sized city gas station parking lot, someone would not have been at least *near* the projected path of the car. Knowing that Scott had already acted in a dangerous manner, how could anyone be sure that he would follow a straight path out of the station?[11] Moreover, it is fair to assume that some of the 12 to 14 people in the

---

[10] No information is provided as to where these two individuals were standing in relation to where the officer was standing, raising a question as to whether they had the same angle of view as did the officer who was standing directly behind the car.

[11] This assumes (in plaintiffs' favor) that the projected path out of the lot was obvious and that there was not more than one exit.

gas station parking lot would have been moving about in the process of getting and paying for gas. People inside the building could have emerged at any moment. Under plaintiffs' theory, the officer would not only have to be certain that this fleeing felon would take a particular path without veering off, but also that none of the bystanders would inadvertently wander into this path. It is true that, as it turned out, these things did not happen but this is something that only could have been known after the fact. Edinburg did not have the luxury of hindsight but instead had to make a judgment quickly and under duress.

The above argument rests on the notion that the officer's perception was faulty and that he mistakenly perceived a risk when there was none. In their second argument, plaintiffs suggest that his concern for the safety of others was not even genuine. Plaintiffs rely on the deposition testimony of three Chicago police officers who talked to Edinburg immediately after the shooting. In their deposition, they recall Edinburg stating that he used deadly force because he was afraid for his own life but they could not recall him mentioning that he did so either because Scott had committed a forcible felony under Illinois law or because he was afraid for the safety of others.

This is a much stronger allegation and one that has the potential to unravel defendants' whole case by suggesting that the officer is now fabricating the entire story to cover up some other, improper motivation. *See, e.g., Garvin*, 2002 WL 1974397 at *5 ("there were a number of inconsistencies in [the officer's] recitation of events, which in turn called into question his credibility").

Once again, when examined more closely, this argument turns out to be less compelling than might appear at first glance. As an initial matter, it is not even clear that Edinburg failed to

cite this rationale immediately after the shooting. These officers in their deposition testimony only stated that they could not recall Edinburg mentioning this rationale. Sergeant Buxbaum explicitly prefaced his comments by saying that he could not remember all of what was said and that his conversation was not extensive. He also did not recall Edinburg mentioning other important facts about the incident such as the number of shots fired or the manner in which they were fired. This leads to another point. These officers were not conducting an official investigation at the time. Sergeant Buxbaum stated that he purposefully did not go into any detail with the officer: "I didn't want to get too far into it because the state's attorneys were coming and they were going to talk to him. It wasn't my investigation at that point in time." Officer Townsend made a similar comment, stating at one point that he could not recall what Edinburg said "because primarily [] we were guarding the scene, and we were collecting [] witnesses, during all that time."

But even assuming that Edinburg failed to mention this point, this failure is not significant. It is important to first remember that plaintiffs are only suggesting that Edinburg changed the underlying reasons (or motivational rationale) for why he used deadly force. They have not suggested that he made inconsistent statements about the underlying factual details of the encounter. In fact, the deposition testimony of Officers Townsend and Boone seems to confirm that Edinburg described the factual details of the encounter immediately after the shooting in the same basic way he later described them in his deposition. Thus, this case differs from one like *Garvin* where the officer's "recitation of events" was suspect.

Plaintiffs' argument is more similar to one made by plaintiffs in *Maravilla v. United States*, 60 F.3d 1230 (7th Cir. 1995) who claimed that officers on the scene gave "conflicting

statements" for using deadly force with some of them mentioning self-defense and others mentioning defense of others as the rationale. *Id.* at 1232. In affirming summary judgment in favor of the defendants, the Seventh Circuit stated that this type of argument was "beside the point":

> This so-called conflict between the officers' stated justifications is beside the point. Under the Fourth Amendment the inquiry is whether the officer's decision to use deadly force was *objectively* reasonable.

*Id.* at 1233 (emphasis in original). The Seventh Circuit went on to look at what a "reasonable officer" in the same situation would have done. *See also Graham v. Connor*, 490 U.S. 386, 397 (1989) (courts should look at whether the officer's actions were objectively reasonable "without regard" to the officer's "underlying intent or motivation").

Moreover, the rationale of self-protection and the rationale of protecting others are not incompatible under the facts of this case because both were present during the encounter. Plaintiffs have tried to make much out of the fact that the car may have been moving forward at the time the first shot was fired, the implication being that the officer was no longer in danger and could not have relied upon the self-defense rationale. This argument overlooks the fact that these events all took place within a very small amount of time. Edinburg described the turning around of the car and the shooting as happening essentially "simultaneously" and was not sure of the precise moment he fired during this sequence. We have already established that, until the car started going forward, Edinburg in fact was in danger. Even under plaintiffs' interpretation, the first shot was fired just as the car starting going forward.[12]

---

[12]Of course, the *decision* to shoot would have been made some small amount of time before the shot was actually fired.

More importantly, plaintiffs ignore the fact that the two rationales are intertwined. The reason that Edinburg was concerned for the safety of others was because his own safety had been threatened. Edinburg's deposition testimony illustrates this point and is worth quoting again: "I felt that since I announced that I was a police officer and he had already tried to run me down that he was willing to run anybody and anything over in front of him. Therefore, he needed to be stopped." Given that these two rationales were connected in this way, Edinburg's (alleged) failure to mention the second rationale is not significant.

In sum, although plaintiffs have tried to cast doubt on the officer's story, they have not succeeded and summary judgment is appropriate.[13] The type of arguments made by plaintiffs here are more like the ones made in *Plakas v. Drinski*, in which the Seventh Circuit affirmed a grant of summary judgment in favor of the officer, than like the ones made in *Garvin v. Wheeler*, in which the Seventh Circuit stated that the district court had properly denied summary judgment.[14] In *Plakas*, an officer shot and killed a man who was menacing him with a fireplace poker. The Seventh Circuit affirmed the granting of summary judgment to the officer even though the plaintiff had argued that the "self-defense story was full of holes." 19 F.3d at 1144. For example, the plaintiff pointed out that the officer claimed he tripped over a tree when retreating from the decedent but other evidence suggested there was no tree. The court

---

[13]The parties focused primarily on the Fourth Amendment claim and made only brief references to the state law claims. However, we find that the same points discussed in this opinion apply equally to the state law claims and see no need to engage in further analysis. Also, having found that no constitutional violation took place, we will not consider defendants' other argument relating to qualified immunity.

[14]The Seventh Circuit technically ruled that it lacked jurisdiction to hear the appeal because it had been filed too late but went on to discuss the underlying summary judgment ruling.

-16-

concluded, in effect, that the contradictory evidence was not strong and, even if true, was not material. *Id.* at 1147.

In contrast, in *Garvin*, the officer's account of what happened was contradicted by other officers at the scene, by forensic evidence, and even by the officer's own expert witness. The officer claimed that the decedent was holding a gun during the encounter but the police expert found no latent fingerprints to substantiate this claim. Also, the entry and exit wounds on the body were not consistent with the officer's testimony.[15]

We finally address the fact that Edinburg fired 6 to 8 more shots after the car left the parking lot. Neither side focused much attention on this part of the encounter. Defendants have a rationale for not doing so. Relying on their expert, Dr. Kalelkar, they state that Scott was killed by one of the first two shots that were fired in the parking lot and then argue that the reasonableness of any subsequent shots is irrelevant. As noted above, plaintiffs have disputed this assertion, largely on procedural grounds, even though they seem to agree that one of the "first few" shots killed Scott. Plaintiffs have offered no other theory as to which bullet killed Scott nor do they have an expert witness to counter defendants' expert.

In any event, proceeding on the assumption that one of the later shots may have killed Edinburg, we still find that summary judgment is appropriate. Plaintiffs have offered no serious

---

[15] On the larger question of whether the first two shootings were reasonable, plaintiff's expert comes very close to saying they were. He stated at several points in his deposition that the first two shots were "justified" although they were not "reasonable." When asked to explain the difference between the two concepts, he failed to point to any real distinction. At one point, he stated that the officer's actions were not reasonable because the officer should have first pursued less deadly alternatives. This fact is irrelevant to the analysis. *See Plakas*, 19 F.3d at 1148 ("where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first"). Although not a basis for our current decision, these statements raise a real question as to whether plaintiff's expert would be persuasive to a jury.

argument as to why the shooting, if reasonable from inception, became unjustified thereafter. Plaintiffs' expert opines that the officer violated various police practice rules such as shooting with one hand and shooting at a moving car. However, the fact that the officer may have violated such rules does not by itself establish a Fourth Amendment violation. The basic conclusion that the Scott was dangerous and a risk to others was still present and arguably even stronger later in the encounter given that Scott did not stop in response to being shot at.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and judgment is awarded to the defendants and against plaintiffs. This is a final judgment. All other pending motions are moot.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Court Judge

DATED: October 29, 2002